## MOORE v. SUN PRINTING & PUBLISHING ASS'N.

(District Court, S. D. New York. June 28, 1899.)

1. SHIPPING—CHARTER OF VESSEL BY AGENT—RATIFICATION BY PRINCIPAL.

A yacht was chartered for the use of the New York Sun newspaper in gathering news during the war with Spain. Two charters were made,—one for two months, and one following for four months,—and before the expiration of the latter the boat became stranded, and was lost. The charters were procured by the manager of the news department of the paper, who was designated therein as the hirer, but who signed the same "for the Sun Printing & Publishing Company." A guaranty was also given at the time of the execution of the last charter to secure the performance of the contract by the charterer, and purporting to bind the Sun Company, which was signed by the same person, and in the same form. *Held*, that the two instruments must be regarded as having been executed by the same party, and as constituting one contract, and, the company having had the sole benefit of such contract, and having, in the usual course of its business, paid the hire of the boat, the expenses of its operation, and the premiums for certain insurance procured thereon during the term of the charter, it must be considered as having ratified the contract made in its behalf, whatever the original authority of the manager.

2. SAME—CONSTRUCTION OF CHARTER—STIPULATED DAMAGES FOR LOSS OF VESSEL.

The charter provided for the return of the boat in as good condition as it then was, usual wear excepted; that the hire should be paid on signing the agreement; that the charterer should be liable for all damage to the hull or equipment; and that the value of the boat for the purposes of the contract should be considered as $75,000. It further required the charterer to furnish a guaranty in the sum of $75,000 to secure any and all losses and damages which might occur to the boat, or that might be sustained by the owner by reason of any breach of the contract. The instrument of guaranty conformed to such requirements, and expressly limited the liability of the company thereunder to the sum of $75,000. *Held*, that the guaranty was intended to secure the hire, as well as loss or damage to the boat, the full value of which must be considered as $75,000 at the time the charter was signed: and hence, $10,000 having been paid as hire, only $65,000 additional was recoverable, under the contract, for its loss.

This was a suit in personam in admiralty by the owner of a vessel to recover for its loss from the charterer and his guarantor.

Zabriskie, Burrill & Murray, for libelant.

Franklin Bartlett, for respondent.

BROWN, District Judge.   The above libel was filed to recover for the loss of the yacht Kanapaha by stranding on September 5, 1898, when she ran upon a reef on the north coast of Cuba about $2\frac{1}{3}$ miles from the shore and about 7 miles east of Nuevitas while proceeding westward in the service of the defendant.   The yacht had been chartered through the negotiations of Chester S. Lord, manager of the news department of the Sun newspaper, first for a period of two months for $5,000 by charter dated April 1, 1898, and afterwards by charter dated May 14, 1898, for $10,000 more for four months from June 1 to October 1, 1898.   The yacht was used by the Sun as a dispatch boat for obtaining news pertaining to the Spanish War in cruising in Cuban waters.   In both charters Mr. Lord was designated as the "hirer" of the yacht; but each charter was signed "Chester S. Lord for the Sun Printing and Publishing Company."   The charter provided that the hire should be paid on signing the agreement, and that the hirer should man and equip the yacht, pay all expenses and surrender her in as good condition as at the start, fair wear and tear from reasonable and proper use only excepted, and free from all liens and charges, and be liable and responsible for any and all loss and damage to hull, equipment, etc.   In each charter there was also the further provision:

"That for the purpose of this charter the value of the yacht shall be considered and taken at the sum of $75,000, and the said hirer shall procure security or guaranty to and for the owner in the sum of $75,000 to secure any and all losses and damages which may occur to said boat or its belongings which may be sustained by the owner by reason of such loss or damage and by reason of the breach of any of the terms or conditions of this contract."

At the time of the execution of the second charter the yacht was at sea in the service of the respondent under the former agreement; and when the second charter was executed and delivered, the agreement of suretyship which it called for was at the same time delivered to the libelant.   This latter agreement purports to be between the Sun Printing & Publishing Company and the libelant.   It refers to the charter dated May 14, 1898, as annexed and made part thereof, and declares that at the request of the hirer, the defendant "enters into the following understanding and agreement of suretyship: First, that the hirer will well and faithfully perform everything in the annexed agreement upon his part to be performed; second, that the respondent expressly waives and dispenses with notice of any demand, suit or notice of nonperformance, etc., the intention of this understanding being to hold us primarily liable under the terms of the annexed agreement"; third, "that our liability hereunto shall in no case exceed the sum of $75,000."   This instrument, instead of being executed by some other person than Mr. Lord, was signed like the charter itself, "Chester S. Lord for Sun Printing and Publishing Association," without more; and it was acknowledged by him before a notary public, as done "under authority of said company and as its act and deed."

The answer denies that Mr. Lord had any authority to execute either the charter parties or the agreement of suretyship on account of the defendant, or that the defendant was bound thereby; it admits that the yacht was used as a dispatch boat by the defendant corporation in cruising and obtaining news, until she was stranded; and al-

leges that in executing the above papers Mr. Lord acted on his own responsibility, and without the authority of the defendant's board of trustees or of any of its members; that the defendant has fully paid for the use made of the yacht by the defendant, and that the yacht was lost by sea perils, without any fault or negligence on the part of defendant or its employés.

Up to within a few days of the loss of the yacht, she had been kept insured for the sum of $60,000 under various policies taken out by Chubb & Sons as agents, for which on three different occasions bills had been rendered to the defendant and the premiums paid by the defendant's checks. These insurances, however, which had been previously three times renewed, all expired on September 1st, four days before the yacht was stranded, and were not again renewed. The libelant claims that the defendant is responsible as principal under the charter as well as under the guaranty; and that the loss being total, the liability is fixed at $75,000 as in a valued policy; and that the defendant is, therefore, liable under the agreement for that amount.

1. The first question litigated is whether the charter is to be held the contract of the Sun, or as only the agreement of Mr. Lord, through lack of authority on his part to bind the defendant. The two papers are inartificially drawn and executed. The intention of the owner apparently was to let the ship nominally and in form to Mr. Lord, who is called the "hirer"; and at the same time to take a guaranty from the Sun, the defendant, by which it should make itself virtually the principal; but Mr. Lord evidently did not understand that he was hiring the yacht individually, since he did not sign the charter in his own name simply or for himself, but only "for the Sun Printing and Publishing Company." And the guaranty annexed to the charter, which purported to bind the Sun as "primarily liable," i. e. as virtual principal, was not signed by any officer of the Sun as an independent obligation would naturally have been signed, but by Mr. Lord only, "for the Sun Printing and Publishing Association." The two papers must be construed together, therefore, and as forming one contract; so that if Mr. Lord had authority to bind the Sun, it must be held from the form of the signatures to both papers that the defendant is bound thereby, since it is obvious that Mr. Lord intended to bind the Sun and not himself.

Though written charters of vessels were formerly made under seal and the forms still in use thus read, they have long since ceased to be usually executed under seal. Indicating only the letting and hiring of the vessel according to the terms agreed on, the charter is equally valid if by parol only, and parol charters are constantly enforced in this court. The authority to execute unsealed charters like the present, therefore, does not differ in its nature or circumstances from that required for making any other business contract, and in case of dispute the authority to execute it is to be gathered from all the legitimate evidence and circumstances bearing upon it.

In the present case none of the immediate parties to the negotiation or to the execution of the contract have been examined as witnesses;—neither Mr. Lord on the part of the defendant, nor Mr. Man-

ning, who was the agent of the libelant, and who executed the charters on the libelant's part. Many circumstances, however, are brought out in the evidence in regard to the conduct of the parties during the charter period, as well as before, from which no doubt is left in my mind that these contracts must be deemed legally to be the contracts of the Sun, the defendant; that Mr. Lord had such general authority as was sufficient to enable him to enter into these contracts; that he intended to bind the defendant and not himself, and that the trustees and managing officers of the defendant had such general knowledge of his acts in hiring the yacht and such perfect means of knowledge of all the particulars, had they desired to know them, as to make their acts in using the yacht under the charters, as they did, a ratification of Mr. Lord's action, and to bind them for the performance of his agreements made in their behalf. The following are some of the principal of these circumstances.

Mr. Lord had for 20 years been the manager of the news department of the Sun, and as such had been accustomed to make all necessary contracts in that department, and to engage, direct and send out reporters to procure news; for that purpose he had been previously accustomed to hire boats to accompany races, and during the war with Spain he also hired two other boats at different times for similar use as the Kanapaha. His bills incurred in this business were paid by the defendant either in cash or by checks to his order, entered in the books of the defendant, examined and reported monthly, and approved by the defendant. The same course was pursued as regards the charter hire and all the expenses of the Kanapaha during the five months previous to her loss. The charter money on both charters, viz. $5,000 and $10,000, respectively, was paid in advance in April and May by checks of the defendant; the premiums of insurance at three different times were also paid by the defendant's checks; and all these checks were reported and entered in defendant's books in the usual course. The yacht, and the other boats employed at the same time, were used exclusively for the benefit of the defendant in procuring news through reporters under the direction of Mr. Lord, and this yacht was navigated from place to place by the master and crew as directed by the Sun reporter in charge. All the expenses of the outfit, maintenance, wages and repairs of the vessels were borne and paid by the Sun. About $5,000 was received from other publishers for news obtained by this yacht and sold to them by Mr. Laffan, the general business and financial manager of the defendant and one of its trustees. Mr. Dana, the president of the defendant, had general information of the arrangements made by Mr. Lord to procure news by means of these different vessels, although he made no inquiry as to details, as these were generally left to Mr. Lord's management. Mr. Laffan was not examined as a witness, and the other two trustees of the defendant gave no attention to any of the particulars of Mr. Lord's department.

From these circumstances it is evident that the hiring of the yacht was for the exclusive use of the Sun, and not for any personal use by Mr. Lord; that it was used for the Sun's benefit only, and in the customary line of Mr. Lord's employment in procuring news; and

there being no suggestion of any concealment of any of the particulars from the trustees and full means of knowledge being available to them, the above circumstances together with the payment of all expenditures by the defendant, leave no doubt of the ratification by the defendant of Mr. Lord's acts, equivalent to an original authority, even if any doubt could exist of Mr. Lord's original authority arising from the larger responsibilities attached to these later contracts.

2. The yacht having been totally lost, the defendant under the agreement in the charter "to be liable and responsible for any and all loss and damage" as well as by the agreement to surrender the yacht "in as good condition as at the start, fair wear and tear from reasonable and proper use only excepted" as well as under the agreement of suretyship, so called, engaging that the hirer should "well and faithfully perform and fulfill everything in and by the said agreement on his part to be kept and performed,"—became liable to the libelant for his loss and damage through the failure to return the yacht on the 1st of October, when the charter expired. The libelant contends that he should be paid $75,000 for this loss and the failure to return the yacht; because the charter contains the statement that "for the purpose of this charter the value of the yacht shall be considered and taken at the sum of $75,000." It is noticeable, however, that neither in the immediate context nor anywhere in the charter or in the agreement of suretyship, is there any agreement that the sum of $75,000 should be paid for the failure to return the yacht at the end of the charter period. That clause in the charter, on the contrary, stands in immediate connection with, and seems to be the inducement to, the further clause by which the hirer agrees to "procure security or guaranty to the owner in the sum of $75,000 against any and all loss and damage which may occur to said boat or its belongings which may be sustained by the owner by reason of such loss or damage and by reason of the breach of any of the terms or conditions of this contract." One very important part of the contract and its obligations was the payment of the charter hire of $10,-000; and the security required to be given by the terms of the charter and by the agreement of suretyship, which was in fact given and delivered at the same time the charter was signed, includes, therefore, the payment of the charter hire as well as the performance of the many other obligations contained in the charter. The charter hire of $10,000, as the evidence shows, was paid by the Sun's check, which was dated on May 14th, the same date as the charter, but paid, according to the evidence, on May 16th. So much of its obligation of $75,000 has, therefore, been discharged by the Sun; and the express provision of the second instrument, called the "agreement of suretyship," is that "in no case shall the liability of the Sun exceed the sum of $75,000." Even if the two agreements be regarded as virtually one, as it would seem they must be, still this latter clause must control the general expressions preceding; and this leaves, after the Sun's payment of $10,000 for the charter hire, but $65,000 principal as the limit of any further obligation on its part.

Looking at the different clauses of the agreement and the circumstances, I think the libelant is entitled to a judgment for the above

sum with interest from October 1st, and that this construction alone can reasonably give effect to the apparent intention of the parties. Some effect must be given to the clause declaring that $75,000 shall be considered and taken as the value of the yacht. This means, I think, the value at the beginning of the charter period. Considering that the yacht was to be used continuously in cruising in belligerent waters, the special risks incident to such navigation, the actual depreciation of the yacht even though any accidental damages from such navigation were reasonably well repaired, as well as the ordinary depreciation from reasonable wear and use, which the charter recognizes and contemplates, and considering further that the charter period terminated at about the close of the ordinary yachting season, when opportunities for letting or rechartering would be much diminished,—there can be no doubt that the value of the yacht at the close of the charter period must have become, and must have been expected to become, very considerably less than at the beginning; while the large amount of the charter hire—$10,000—a considerable proportion of the whole value of the yacht at the date of the charter, shows that the intention was to compensate the owner fully for all such risk and depreciation. Taking, therefore, the value fixed, namely, $75,000, as the agreed value of the yacht at the beginning of the charter on the one hand, and the express limitation that in no event should the liability of the defendant exceed $75,000 on the other hand, of which the $10,000 charter hire was a part, and has been paid by the defendant, the payment of the remaining $65,000 with interest from the termination of the charter period should be regarded as meeting the intention of the parties.

Any different construction, it seems to me, would manifestly contradict the presumed intention. Suppose the vessel had been lost at the end of the first week of the charter period; is it possible to suppose either that the libelant expected to receive, or that the defendant expected to pay $75,000 besides the $10,000 already paid and received, making $85,000 in all? To me it seems manifestly not. That would be $10,000 more than the entire value put upon the yacht; and it may certainly be assumed that the libelant in fixing the estimated value at the beginning of the charter, made it sufficiently high to afford him perfect indemnity. And so if the yacht had been lost before the charter hire was paid—and it often happens that the payment of charter hire agreed to be paid at the execution of the charter, is more or less postponed—it seems clear that the Sun could not have been required to pay more than $75,000 in all; and the fact that the charter hire was paid by the Sun, and the yacht lost later, cannot increase the extent of the Sun's liability. The further fact that the yacht was insured by the defendant in the sum of $60,000, though not binding upon the libelant, because not an act to which he was privy, is at least to some extent indicative of the proximate liability for the yacht herself, as understood by the defendant, though not of course conclusive. Had the intention of the parties been that the sum of $75,000 should be paid to the libelant for failure to return the yacht at the close of the charter period, it seems to me that some more direct language indicative of that purpose would have been

used in the charter. The entire absence of any direct expression of that kind, and the absence of any provision requiring the defendant to insure the vessel or keep her insured in any specific sum, are opposed. as it seems to me, to the present contention of the libelant in this regard; while the specific provision that the entire liability of the defendant should not exceed $75,000 (including the payment of the charter hire, which the defendant has already paid) indicates the remaining sum of $65,000 with interest as the amount required to be paid upon the total loss of the yacht.

The valuation clause in marine policies of insurance is not analogous, I think, to this charter. In such policies that clause has reference to a single object, namely, the rights of the parties upon a loss by sea peril. In this charter its object was to determine also the amount of security, which was designed to cover and does cover a multitude of particulars, as well as the important obligation to pay the charter hire.

Decree accordingly for $65,000 with interest as above and costs